2026 IL App (1st) 231434-U

No. 1-23-1434

Order filed June 10, 2026

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | No. 20 CR 11606 |
| v. | ) ) | |
| JOSE ZAVALA, | ) ) | Honorable Mark W. Martin, |
| Defendants-Appellants. | ) | Judge, presiding. |

PRESIDING JUSTICE MARTIN delivered the judgment of the court.
Justices Lampkin and Rochford concurred in the judgment.

**ORDER**

¶ 1      *Held*:    We remand the case to the trial court, where a proper fitness hearing was not held prior to allowing the defendant to represent himself *pro se* at trial.

¶ 2      Following a jury trial, defendant Jose Fermin Zavala was convicted of the first degree murder of Carlos Macial Pulido[1] (Vicente), and of being in possession of a stolen motor vehicle. He now appeals, arguing the trial court erred when it allowed him to proceed *pro se* at his own

_____

[1]Carlos Macial Pulido was known to his wife and friends as Vicente. The medical examiner referred to him at trial as Vincente Rios Sanchez. We refer to him throughout as Vicente.

fitness hearing, and found him fit to stand trial based solely on stipulations. For the following reasons, we remand the case to the trial court for a retrospective fitness hearing.[2]

¶ 3                                                    I. BACKGROUND

¶ 4          On May 20, 2020, a man behind the wheel of a stolen Toyota Highlander pursued Vicente as he ran for his life through neighborhood streets in Wheeling, Illinois. As Vicente fled toward a nearby house, the man accelerated to over 33 miles per hour (mph) and drove onto the home's lawn, deliberately crashing into Vicente and sending him through the front of the residence.

¶ 5          Zavala was arrested on October 14, 2020 in connection with the incident, and charged with first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2020)) and possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2020)). Prior to his jury trial, Zavala—during numerous courtroom outbursts—repeatedly expressed his displeasure with his court-appointed attorney and requested to have another attorney appointed. Zavala felt his demands for a speedy trial were being ignored and believed that his attorney was not working in his best interest.

¶ 6          At a hearing on September 28, 2022, defense counsels informed the trial court that they had filed a motion to withdraw, as Zavala was planning to fire them that day. The court engaged in a lengthy discussion with Zavala regarding his decision to fire his attorneys. During this conversation, Zavala stated "It don't matter. I'm ready to die already. I already tried. I'm suicidal because this is driving me crazy." After the court explained that Zavala could either continue with the Assistant Public Defenders (APDs) appointed to represent him or proceed *pro se*, Zavala ultimately consented to the APDs' continued representation.

¶ 7          Several months later at a status hearing, Zavala reiterated his request to fire his APDs. The trial court and Zavala engaged in the following colloquy:

---

[2]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

"THE COURT: All right. I have to do some extensive admonishments. I don't know anything about your background whether it's a situation where a BCX[3] might be in order because I have to make certain findings under Rule 401, and I'm not familiar enough to do that at this point.

MS. GLENNON: Judge, with respect to fitness, I have no – as his attorney for the last over a year, I have no *bona fide* doubt as to fitness.

THE COURT: I'm talking about fitness to waive the right to counsel, competency to do that. It's a finding I have to make under Rule 401."

* * *

ZAVALA: Your Honor, I want to go *pro se* today, your Honor.

THE COURT: Okay. Sir, the Public Defenders are still on the case.

ZAVALA: Well, I fired them many times before then.

THE COURT: Okay, sir.

ZAVALA: Many times before you.

THE COURT: Sir, you have only been before me once before, so it hasn't been many times. We will see you – we will see you on January 4th. Are you agreeing to that date?

ZAVALA: Not by agreement.

THE COURT: The lawyers are still on the case at this point. I have yet to discharge them.

ZAVALA: I object and not by agreement. It is not by agreement. It's my case, my life.

---

[3]Behavioral Clinical Examination (BCX).

THE COURT: Sir, we will see you on January 4th.

MS. WRIGHT: Judge, can we inquire as to whether –

THE COURT: You know what, at this point given the defendant's outburst, the Court is going to order a BCX, all right, for fitness to waive his right to counsel."

¶ 8     During the next court date, the court noted that Forensic Clinical Services (FCS) was unable to complete the requested BCX due to lack of various documents. The court then stated:

"One thing I should make clear is while the Court did request a BCX to determine the defendant's fitness to waive his right to counsel and represent himself, the standard is his fitness to stand trial. If he's fit to stand trial, then he's fit to represent himself. And the only way that would be overridden is if he were severally mentally ill. So I think we need to clarify for the 10th floor that we need an opinion on fitness to stand trial."

An amended BCX order was sent to FCS. Zavala again engaged in several outbursts, insisting he be allowed either to proceed *pro se* or have a different APD assigned to his case.

¶ 9     On March 10, 2023, the court stated that it had requested a BCX for fitness to stand trial, but Zavala "refused to cooperate which is the reason why we don't have a response." At the subsequent court date, Zavala again attempted to file a motion to have another attorney appointed. After denying the motion, the court and Zavala engaged in the following colloquy:

"THE COURT: So you do wish to continue with the services of your lawyers now that your motion has been denied?

ZAVALA: No.

THE COURT: You wish to represent yourself?

ZAVALA: I need to see you deny my motion first.

THE COURT: I just denied it. Denied.

ZAVALA: Okay. Is it on the record denied?

THE COURT: The court reporter is right here taking it down.

ZAVALA: Okay. I want to represent myself then.

THE COURT: If you want to represent yourself, you're going to have to cooperate with the psychiatrist to evaluate you for fitness to stand trial. So if you want to do that, you have to cooperate with them. I ordered it before and you refused to cooperate.

ZAVALA: I never refused anything.

THE COURT: I'll order a BCX. When the forensic clinical services seeks to interview you, you have to cooperate in order to represent yourself. I have to make findings that you're fit to do that, that you're fit for trial.

ZAVALA: I am.

THE COURT: That has to come from the doctors, and I have to admonish you. So you'll be allowed to represent yourself, but it's not just a process of you saying I want to represent myself. I have to make findings. I have to admonish you. I have to take into consideration whether you're fit to stand trial. So if you want to do that, that certainly is your constitutional right, but you have to cooperate with the forensic clinical services, and we ordered that before and you refused to cooperate.

ZAVALA: I will.

THE COURT: All right. So reorder the BCX, fitness to stand trial only. The Court has a *bona fide* doubt."

¶ 10     The court held a status court date on April 27, 2023, which it began by noting, "There is a return from Forensic Clinical Services. A finding of fitness." Later in the hearing, Zavala again expressed his wish to proceed *pro se*. The court then engaged in thorough Rule 401

admonishments, (Ill. S. Ct. R. 401 (eff. July 1, 1984)), ensuring Zavala understood: (1) the counts he was charged with, (2) the potential sentences he faced, (3) the possibility of consecutive sentences, and (4) his right to a court-appointed attorney. The court additionally ensured Zavala was knowingly and intelligently, voluntarily waiving his right to be represented by counsel. The court then engaged in the following discussion:

> "THE COURT: And there was a finding of fitness from Forensic Clinical Services, and that is the standard for determining whether someone is competent to waive their right to counsel. Are you agreeing to that report that was filed –
>
> ZAVALA: Yes, sir.
>
> THE COURT: -- by Forensic Clinical Services?
>
> ZAVALA: Yes, your Honor.
>
> THE COURT: So that report will be received without objection."

¶ 11    Zavala was further admonished that he would be held to the same standard as an attorney and that neither the court nor the State could give him legal advice. Zavala accepted that he would be at a disadvantage but still declared his intent to proceed with representing himself. Finally, the court accepted Zavala's waiver of counsel and granted defense counsel leave to withdraw. After defense counsel made it known to the court that Zavala had requested a Spanish interpreter in the past, the court noted that it intended to re-admonish Zavala with an interpreter at a later court date.[4]

¶ 12    At a subsequent hearing, in the presence of a translator, the court again thoroughly admonished Zavala pursuant to Rule 401. Over the next few court dates, Zavala continued his demand for speedy trial and a date of June 26, 2023 was set.

---

[4]The court clarified for the record that Zavala appeared to understand English and had always responded in English. Defense counsel noted that they had only communicated in English outside of court, as well.

¶ 13        During a pretrial conference held on June 22, the court *sua sponte* ordered a fitness hearing. The hearing proceeded as follows:

"THE COURT: On another note, Forensic Clinical Services evaluated the defendant for fitness to stand trial in a letter filed on April 25, 2023. Jenny, J-e-n-n-y, Wansat, W-a-n-s-a-t,[5] a licensed clinical psychologist found Mr. Zavala fit to stand trial. In an abundance of caution, we will proceed to a fitness hearing.

Does the State stipulate to the Forensic Clinical Services report?

STATE: Yes, we would.

THE COURT: Mr. Zavala, do you stipulate – that means agree – to the report that the person who examined you found you were fit to stand trial?

ZAVALA: Yes, your honor.

THE COURT: All right. Based on those stipulations, the Court will formally find the defendant is fit to stand trial."

¶ 14        On June 26, the parties chose a jury and trial began. Because the facts of the case have no bearing on the matter before this court on appeal, we only briefly recount the facts adduced at trial.

¶ 15        Maria Zavala[6], Vicente's wife, was getting ready to drive her husband to work at approximately 7:15-7:20 a.m. on May 20, 2020, when someone began knocking on her son's bedroom window. Maria went to the window and saw a man she did not recognize, whom she later identified in court as Zavala. She told Vicente and, following more insistent knocking, Vicente went to the window. Maria inquired if Vicente knew the individual and he replied, "it was a Salvadorian." A few minutes later, Maria heard Vicente exit the front door of their apartment.

---

[5]This is a scrivener's error, as the letter is signed by Jenny Wamsat.

[6]Though they share a last name, Maria Zavala is not related to Jose Zavala. We use her first name for clarity.

When Vicente had not returned several minutes later, Maria became concerned. Realizing he would be late for work, she looked for her cell phone to call him. She observed three missed calls from Vicente. Vicente did not answer when she returned his call, so Maria and her father left the apartment to look for him. Maria "knew something was wrong" when she found Vicente's work shoe and his glasses scattered outside their apartment. Vicente never returned.

¶ 16　　Maria De Los Angeles Garcia Delgado (Delgado), who lived at the same apartment complex as Vicente (although in a different building), was getting ready to leave for work around 7 a.m. on May 20. Delgado left her Toyota Highlander running outside her building, with the keys in the ignition, while she quickly ran inside her apartment to grab her lunch. When she returned, the Highlander was gone. Delgado and her daughter looked for the vehicle nearby but could not find it. They called the police to report the car stolen. Later that same day, a police officer took Delgado to the Wheeling Police Department to obtain her permission to search the recovered Highlander.

¶ 17　　James J. Mann was driving to work at approximately 7:30 a.m. on May 20 when he observed a man running in the grass on the parkway near Elmhurst Road with an SUV following close behind. After Mann saw the man turn onto Equestrian Drive, with the SUV pursuing, he followed. He watched as the man ran toward a home and saw the SUV accelerate through flower beds before running into the man and the house.

¶ 18　　Spouses Tanya Kirilova and Manuel Soto lived in the 700 block of Equestrian Drive in Wheeling in May 2020. At approximately 7:30 a.m. on May 20, Kirilova was standing at her front door to wave goodbye to Soto, who was in his vehicle. Kirilova observed a man running from Elmhurst Road onto Equestrian, and past her driveway; an SUV was pursuing the man. As the man approached her neighbor's home, the SUV accelerated, hitting the man and driving him into the

neighbor's house. The driver of the SUV, whom Kirilova and Soto identified in court as Zavala, exited the car and ran on foot. Soto exited his own vehicle and chased after Zavala, eventually catching up to him. The two men fought several times and Zavala ultimately fled. Soto later identified Zavala in a photo array as the individual who drove the SUV.

¶ 19     Taxi driver Ismael Reyes interacted with a limping man in the afternoon of May 20 and later identified Zavala in a photo array as the individual he spoke to. Saul Arreola also interacted with a limping man on the afternoon of May 20.

¶ 20     Various police officers and detectives explained their roles in investigating the Toyota Highlander accident. Detective Matthew Lee testified that the victim, who died of multiple blunt force injuries, was identified as Vicente. Officer Olen Yusypyuk reviewed the crash data from the Toyota Highlander, which indicated in the three and a half seconds prior to impact, the car accelerated from 13.7 to 33.6 mph. Latent fingerprints were recovered from inside and outside the Highlander, but only one print was suitable for comparison. That print could not be matched to either Zavala or Delgado. Blood stains were recovered from the inside and outside of the driver's door, and Zavala was a confirmed inclusion, with a 1 in 527 nonillion probability of the blood not being Zavala's.

¶ 21     Angel Macedo was friends with Vicente and knew Zavala as "El Salvadoreno." Macedo had heard that Zavala was upset at Vicente due to some rumor involving Zavala's wife. Martin Cortez Alvarez was also friends with Vicente and knew Zavala as "El Salvadoreno."

¶ 22     Zavala filed motions with the court and cross-examined select witnesses throughout the State's case-in-chief. He declined to call any witnesses of his own, and chose not to testify in his own defense

¶ 23    The jury found Zavala guilty of all charges. Zavala maintained that he wished to remain *pro se* for post-trial motions and sentencing. He filed a motion for a new trial, which was denied. The court sentenced Zavala to concurrent terms of 50 years' incarceration for first degree murder, and 5 years' incarceration for possessing a stolen vehicle. Thereafter, Zavala requested and was appointed counsel for purposes of filing any post-sentencing motions. This timely appeal followed.

¶ 24                                    II. ANALYSIS

¶ 25    On appeal, Zavala argues that the trial court erred by allowing him to proceed *pro se* at his own fitness hearing and by finding him fit to stand trial based solely on the parties' stipulation to the psychologist's conclusion that Zavala was fit. He contends that the proper remedy in this case is reversal of his convictions and remand for a new trial, where the court's prior fitness hearing failed to create a factual record of his fitness at the time. The State counters that Zavala has forfeited these claims, as neither his *pro se* motion for new trial nor his motion to reconsider sentence (filed by appointed counsel) raised any noncompliance with fitness hearing issues. *People v. Sebby*, 2017 IL 119445, ¶ 48 ("To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion. [Citation.] Failure to do either results in forfeiture."). Zavala admits he did not raise either of these issues below; they are therefore forfeited on appeal. However, Zavala asks that we review his contentions under the plain error doctrine.

¶ 26    Under certain circumstances, the plain error doctrine permits review of an otherwise forfeited claim of error. *Id.*; *People v. Johnson*, 238 Ill. 2d 478, 484 (2010). The doctrine allows this Court to address clear and obvious errors that were unpreserved at the trial level. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). A defendant must show either that (1) "the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant,

regardless of the seriousness of the error," or (2) the "error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." (Internal quotation marks omitted.) *People v. Reese*, 2017 IL 120011, ¶ 60. A court's misapplication of the law amounts to plain error if it affects a defendant's fundamental right to liberty. *People v. Smith*, 2016 IL App (1st) 140496, ¶ 15. Plain-error review is "a narrow and limited exception to the general waiver rule [citations], whose purpose is to protect the rights of the defendant and the integrity and reputation of the judicial process [citation]." (Internal quotation marks omitted). *People v. Herron*, 215 Ill. 2d 167, 177 (2005). The defendant has the burden of persuasion under both prongs of the plain error doctrine. *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

¶ 27        Zavala claims that once the trial court expressed it had a *bona fide* doubt as to his fitness, the court was required to both order a BCX and hold a fitness hearing. Further, Zavala contends, the court was required to appoint counsel to represent him at his fitness hearing. Its failure to do so, he argues, violated his sixth amendment rights. Of note, Zavala does not contend that he was, in fact, unfit to stand trial or that he should have been found so. Nevertheless, fitness for trial involves a fundamental right. *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 28. "Accordingly, courts have repeatedly determined that alleged errors concerning fitness may be reviewed under the plain error doctrine." *Id*. See also *People v. Finlaw*, 2023 IL App (4th) 220797, ¶ 47 (fitness for trial is reviewable as plain error under the second prong, where it involves a fundamental right); *People v. Johnson*, 2024 IL App (5th) 220608-U, ¶ 16 (noting that alleged errors concerning fitness may be reviewed under the plain error doctrine). As previously stated, Zavala requested second-prong plain error review. Because the question here concerns Zavala's fitness, we will grant his request and review the issue for second-prong plain error.

¶ 28        "The due process clause of the fourtheenth amendment bars prosecution of a defendant unfit to stand trial." *People v. Holt*, 2014 IL 116989, ¶ 51. However, defendants are presumed to be fit to stand trial, *People v. Harris*, 2013 IL App (1st) 111531, ¶ 80, and are only unfit if, "based on a mental or physical condition, [they are] unable to understand the nature and purpose of the proceedings against [them] or to assist in [their] defense." *People v. Cook*, 2014 IL App (2d) 130545, ¶ 12. Some of the factors relevant to a determination of whether a *bona fide* doubt exists include: "(1) the rationality of the defendant's behavior and demeanor at trial; (2) counsel's statements concerning the defendant's competence; and (3) any prior medical opinions on the issue of the defendant's fitness." *People v. Hanson*, 212 Ill. 2d 212, 223 (2004).

¶ 29        "Courts have consistently held ' a defendant's waiver of counsel is valid only when it can be shown from the record that the waiver was made knowingly and intelligently.' " *People v. Washington*, 2017 IL App (4th) 150054, ¶ 17 (quoting *United States v. Purnett*, 910 F.2d 51, 54-55 (2d Cir. 1990)). When a defendant who is fit to stand trial is

> "determined to waive the right to counsel, a trial court must accede to that request. Although a court may consider a defendant's decision to represent himself unwise, if his decision is freely, knowingly, and intelligently made, it must be accepted out of 'that respect for the individual which is the lifeblood of the law.' " (Internal quotation marks omitted.) [Citations.] Once the court has assured itself that the waiver is valid, it may not force a defendant to continue to be represented by counsel he does not want. [Citation.]"
> *Harris*, 2013 IL App (1st) 111531, ¶ 81.

¶ 30        We first examine whether the trial court had a *bona fide* doubt as to Zavala's fitness. Despite the court's frustration at times with Zavala's occasional outbursts and his failure to cooperate with the first BCX, the court never expressly questioned Zavala's mental competency.

Further, Zavala's APD expressed she had no doubts as to his fitness to stand trial and she did not file a motion for psychological examination. Nonetheless, the court explicitly stated on the record it had "a *bona fide* doubt" when it ordered a BCX exam to address Zavala's frequent requests to be allowed to proceed *pro se*.

¶ 31    Clearly, the record here indicates that the trial court was assuaged by the FCS's BCX report finding Zavala fit to stand trial and represent himself. Doctor Wamsat's letter to the court noted:

> "Mr. Zavala is currently **fit to stand trial**. He is not manifesting symptoms of a mental condition that would preclude his fitness at the present time. He is aware of the charge pending against him and is familiar with the roles of various courtroom personnel. He is capable of rationally assisting counsel in his own defense, *if he so chooses; any observation to the contrary should be viewed as volitional in nature, as opposed to the product of a primary mental illness*." (Emphases in original).

The doctor referred the court to her Psychological Summary report for the basis of her opinion, but as noted, that report is absent from the record before us. See *Schacht v. Lome*, 2016 IL App (1st) 141931, ¶ 35 (appellants bear the burden of providing the reviewing court with a complete record on appeal).

¶ 32    With the court's concerns allayed, it continued with Rule 401 admonishments and deemed Zavala was fit to proceed *pro se*. This was improper. See, *e.g.*, *People v. Payne*, 2018 IL App (3d) 160105 (finding that where there is a *bona fide* doubt concerning the defendant's fitness to stand trial, the trial court must hold a fitness hearing); *People v. Guttierez*, 271 Ill. App. 3d 301 (holding that, once facts are brought to attention of trial court which raise a *bona fide* doubt as to defendant's fitness to stand trial, trial court has a duty to hold fitness hearing).

¶ 33    Next, we address the issue of the court's *sua sponte* determination at the pretrial conference that a fitness hearing was needed, "out of an abundance of caution." Following its pronouncement, the court engaged in the following discussion:

"THE COURT: Does the State stipulate to the Forensic Clinical Services report?

STATE: Yes, we would.

THE COURT: Mr. Zavala, do you stipulate – that means agree – to the report that the person who examined you found you were fit to stand trial?

ZAVALA: Yes, your honor."

This comprised the entirety of the fitness hearing. After accepting the parties' stipulation to the doctor's conclusion, the court found Zavala fit to stand trial.

¶ 34    Zavala argues the court erred in deeming him fit to waive counsel based solely on the parties' stipulation to the psychologist's conclusion he was fit to stand trial.

¶ 35    It is well settled that " '[a] trial court's determination of fitness may not be based solely upon a stipulation to the existence of psychiatric conclusions or findings.' " *Cook*, 2014 IL App (2d) 130545, ¶ 14. If the parties choose to stipulate to what an expert would testify to, "rather than to the expert's conclusion, a trial court may consider this stipulated testimony in exercising its discretion." *Id*. But, when a "trial court fails to conduct an independent inquiry into a defendant's fitness [and] instead, relies exclusively on the parties' stipulation to a psychological report finding the defendant fit, the defendant's due process rights are violated." *Id*. ¶ 15 (gathering cases in support of this proposition). Those rights will not be violated, however, if a trial court bases its finding of fitness on stipulations *in addition to* its observations of the defendant and a review of a psychological report. *Id*. Indeed, while a trial court's determination whether a defendant is fit to stand trial must be given great weight on review, the trial record must affirmatively demonstrate

- 14 -

exercise of judicial discretion and judgment insofar as the finding of fitness is concerned. *People v. Greene*, 102 Ill. App. 3d 639, 642 (1981). See *Gipson*, 2015 IL App (1st) 122451, ¶ 29 (noting that fitness involves an issue of constitutional dimension, so the record must show the trial court's discretion and judgment).

¶ 36 The record before us does not demonstrate that the trial court used *any* judicial discretion or judgment in assessing Zavala's fitness. The court proceeded to an unannounced fitness hearing, without counsel to represent Zavala to determine if he was fit to stand trial. Moreover, the entire hearing consisted of the court expressly asking the parties if they stipulated to the report's conclusion that Zavala was fit to stand trial. Once the court proceeded to a fitness hearing, it was incumbent on the court to hold a hearing that complied with due process. Here, there is no indication in the record that the court considered the doctor's report explaining the basis of her determination on fitness, nor is there any indication that it considered the rationality of Zavala's actions and behavior in court. We find this to be in clear violation of Zavala's due process rights. See *Cook*, 2014 IL App (2d) 130545, ¶ 15.

¶ 37 Finally, Zavala argues that the proper remedy for this violation is a new trial, since his previous fitness hearing failed to create a factual record of his fitness at the time. He contends that an accurate retrospective hearing would be impossible. The State argues that, if we find the trial court erred, the proper remedy is not to vacate Zavala's convictions, but to remand for a retrospective fitness hearing on Zavala's waiver of counsel. We agree.

¶ 38 "Rather than automatic reversal, 'retrospective fitness hearings are now the norm.' " *Payne*, 2018 IL App (3d) 160105, ¶ 14 (quoting *Gipson*, 2015 IL App (1st) 122451, ¶ 38). See also *People v. Jenkins*, 2026 IL App (5th) 240613-U (remanding the case for a retrospective fitness

hearing where the trial court failed to state on the record the factual basis for its finding of defendant's fitness).

¶ 39 While there may be a scant record from the fitness hearing itself, there is a lengthy record prior to the fitness hearing which displays Zavala's behavior and interactions with the court and his attorneys. We also have his former attorney's comment in pretrial proceedings regarding the attorney's observations of Zavala's fitness to stand trial. Finally, we agree with the State that the absence of the doctor's BCX report could presumably be remedied on remand, so that the trial court could consider it in conjunction with all other factors.

¶ 40                                    III. CONCLUSION

¶ 41 Based on the foregoing reason, and because the trial court held a fitness hearing which did not comply with due process, we remand this cause for a retrospective fitness hearing which complies with due process, including with the appointment of counsel for that hearing.

¶ 42 Remanded, with directions.